IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CHAD WILLIAMS,

        Plaintiff,

vs.                                        CASE NO. 1:10-cv-203-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions.  (Docs. 19 and 22.) For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) to give proper weight to the treating psychologist opinion of Dr. Khalil Sakalla, Ph.D.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act") on March 3, 2006 alleging a disability onset date of April 28, 2004.[1]  (R. 63-68, 405.)  Plaintiff's application was denied initially and upon reconsideration.  (R. 31-35, 44-46, 47.)  Plaintiff then filed a timely request for an

_____

[1] Plaintiff's initial application for disability insurance benefits alleged an onset date of August 1, 2002, but Plaintiff later amended his application to allege a disability onset date of April 28, 2004.  (R. 478, 482.)

administrative hearing on February 5, 2007.  (R. 43.)  Plaintiff did not appear at the first scheduled hearing, which prompted an Administrative Law Judge ("ALJ") to dismiss his case, but the Appeals Council later reinstated his application on June 19, 2008.  (R. 268-70, 387.)  A second hearing was held before an ALJ on November 3, 2008 and the ALJ issued a written decision dated December 15, 2008 denying Plaintiff's application. (R. 16-28, 283-87, 388-401.)  Plaintiff then appealed this decision to the Appeals Council, which denied Plaintiff's request for review on April 24, 2009.  (R. 13-14, 382-84, 425-27.)

Plaintiff then filed a lawsuit challenging the Commissioner's decision in this Court in Case No. 1:09-cv-140-MP-AK.  (1:09-cv-140 Doc. 1.)  The Commissioner moved to remand the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), on the grounds that the ALJ had improperly relied on the medical-vocational guidelines despite the Plaintiff's nonexertional impairments.  (1:09-cv-140 Doc. 7.) The Court remanded the case to the Commissioner on November 4, 2009 with instructions that the ALJ conduct a supplemental hearing and obtain testimony from a vocational expert upon remand.  (1:09-cv-140 Docs. 8 and 9.)  On March 12, 2010, the Appeals Council remanded the case to the ALJ to conduct proceedings consistent with this Court's order in Case No. 1:09-cv-140.  (R. 437-40.)

A supplemental hearing was held on July 16, 2010 and the ALJ issued a written decision dated August 18, 2010 concluding Plaintiff was not disabled and thus not entitled to a period of disability insurance benefits.  (R. 402-17, 452-57.)  After 60 days elapsed, the ALJ's August 18, 2010 decision became the Commissioner's final decision.  Plaintiff then filed his Complaint in this case on October 19, 2010.  (Doc. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be

---

[2] *See* 42 U.S.C. § 405(g) (2000).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[12]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[13]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

---

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so

---

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[21]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A.    Personal Background

Plaintiff was born on March 13, 1976.  (R. 29.)  Plaintiff graduated from high school, finished one year of college and served as a nuclear field technician in the United States Navy until his discharge in mid-2002.  (R. 483, 485.)

#### B.    Evidence Considered By the ALJ

The evidence considered by the ALJ consisted primarily of Plaintiff's records from his visits to the Veterans Administration ("VA") medical facilities in Gainesville, Florida as well as the reports completed by two non-examining state agency psychologists.  The Court will focus its discussion of the record on Plaintiff's depression and anxiety, as those are most relevant to the issues before the Court in this case.

Plaintiff first reported to the VA on April 28, 2004 complaining he was uncomfortable around people.  (R. 230.)  Upon examination, Plaintiff was "focused on negative aspects of his life" and was diagnosed with dysthymic disorder.  (R. 230-31.)

---

[20] Wolfe, 86 F.3d at 1077-78.

[21] See id.

On another visit on June 10, 2004, Plaintiff reported only feeling "okay" and also reported problems with concentration.  (R. 218-19.)  A mental disorder examination performed on August 6, 2004 by Dr. Michael Haser, M.D. at the VA resulted in a diagnosis of major depressive disorder with recurrent episodes and a GAF of 50.[22]  (R. 155-56.)  Dr. Haser noted Plaintiff was poorly groomed and presented with a depressed affect.  (R. 157.)

Plaintiff did not report for an appointment with psychiatrist Dr. William Gamberino, M.D., Ph.D. at the VA on October 4, 2004.  (R. 218.)  Progress notes from a January 3, 2005 appointment with Dr. Gamberino disclose that Plaintiff reported he did not like being around people, even friends and family, because it caused him anxiety, difficulty breathing and hot/cold flashes with sweating.  (R. 211.)  Plaintiff further reported his social anxiety had progressively gotten worse after he left the Navy and also had caused him to withdraw from the University of Florida.  (*Id.*)  Dr. Gamberino noted Plaintiff's mood was down and his affect nervous. Dr. Gamberino diagnosed Plaintiff with dysthymic disorder and social anxiety disorder, assigned Plaintiff a GAF of 50 and prescribed Celexa.  (R. 212.)  On January 31, 2005 Dr. Gamberino noted Plaintiff appeared nervous with an anxious affect, so he prescribed Clonazepam.  (R. 209-10.)  On March 14, 2005, Plaintiff reported benefits from the Clonazepam, but stated he still had difficulty concentrating and felt "keyed up" when he had to go out shopping Plaintiff was assigned a GAF of 57.  (R. 200-01.)  On May 9,

---

[22] Global Assessment of Functioning, or GAF, is a measure of an individual's psychological, social and occupational functioning.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).  Scores range from 0 to 100 and a score between 41 and 50 represents "serious" symptoms or any serious impairment in social occupational or school functioning; 51 to 60 represents moderate symptoms or moderate difficulties in social, occupational or school functioning.  Id. at 34.

2005 Plaintiff reported he still had significant difficulty with anxiety, particularly around others, as well as low energy and motivation. Plaintiff's GAF was assessed at 55 on this visit.  (R. 194-95.)

On a June 27, 2005 visit to Dr. Gamberino, Plaintiff reported an exacerbation in his depressive and anxiety symptoms due to increased stress from his recent move into his grandparents' house, which required a substantial amount of work to repair as a result of hurricane damage.  (R. 192-93.)  Plaintiff also was forced prematurely to leave a recent weekend visit to a local state park with friends due to excessive social anxiety. (R. 193.)  Plaintiff reported continued trouble with motivation, short term memory and concentration.  (*Id.*)  Plaintiff's affect was restricted and anxious. Dr. Gamberino assigned Plaintiff a GAF of 45 on this visit.  (R. 194.)

On August 1, 2005 Plaintiff complained to Dr. Gamberino he "'can't get it together'" several days a week, meaning he suffered from poor concentration, little motivation, and lack of direction.  (R. 189-90.)  Dr. Gamberino assigned Plaintiff a GAF of 45.  (R. 191-92.)  A mental disorder examination performed on August 23, 2005 by Dr. Billie Warren, Ph.D. reflected a chronic depressed mood with impaired social skills hampered by social anxiety.  (R. 153-55.)  Plaintiff appeared "despondent and discouraged" and was assigned a GAF of 48. Dr. Warren concluded Plaintiff's depression caused Plaintiff significant social impairment and hindered Plaintiff's ability to obtain and maintain employment.  (*Id.*)

On August 29, 2005, Plaintiff visited Dr. Gamberino and reported extreme social impairment, severe baseline anxiety and occasional panic attacks, including "odd sensations including feeling like someone is 'plucking' his nerves, like getting shocked,

when anxious." (R. 185-87.)  Dr. Gamberino noted Plaintiff's affect was restricted and anxious and that Plaintiff continued to suffer from extreme impairment socially and occupationally. Dr. Gamberino assigned Plaintiff a GAF of 45. (R. 185-86.)

On an October 17, 2005 visit to Dr. Gamberino, Plaintiff reported an increase in his baseline anxiety and occasional panic attacks and exhibited a restricted and anxious affect. Plaintiff's GAF was recorded as 45. (R. 182-83.)  Dr. Khalil Sakalla, Ph.D., a VA staff psychologist, performed a consultation of Plaintiff the same day and concluded Plaintiff's mood was dysthymic and his affect congruent. Notably, Dr. Sakalla assessed Plaintiff's condition as chronic.  (R. 184.)  Dr. Sakalla also noted Plaintiff "appeared in distress" over his "discomfort level and feelings of anxiety/phobia."  (R. 184-85.)

On a December 2005 visit to Dr. Gamberino, Plaintiff reported his medications were beneficial for his anxiety but he still "spends most of his time isolating and even then remains symptomatic with anxiety and its physical manifestations."  (R. 179.)  Dr. Gamberino noted Plaintiff had benefitted from treatment but still suffered from extreme social and occupational impairment, and assigned Plaintiff a GAF of 55.  (R. 180-81.)  On a January 19, 2006 visit to Dr. Sakalla, Plaintiff "presented poorly," exhibited a "notable decline" in his depressed mood and had "remarkably different" presentation from his last visit.  (R. 178.)  On a February 2006 visit to Dr. Sakalla, Plaintiff still presented "below his baseline of chronically dysthymic/depressed mood."  (R. 177.)

On a March 6, 2006 appointment with Dr. Gamberino, Plaintiff reported increased depression and memory problems. Dr. Gamberino wrote Plaintiff "continued to suffer extreme impairment socially and occupationally as a result of his condition."

9

(R. 166.)  Plaintiff also reported feeling uncomfortable, even around his own family, and Dr. Gamberino assigned Plaintiff a GAF of 50.  (R. 166-67.)

On a March 22, 2006 visit to Dr. Sakalla, Plaintiff's mood was dysthymic with congruent affect and he presented as "unkempt with poor hygiene."  (R. 164.)  Dr. Sakalla wrote a letter describing Plaintiff's condition to school authorities that same day in which he noted Plaintiff "is seeking psychotherapy for his depression and social anxiety that often impact his daily functioning and prevent him from pursuing social activities including work and/or school."  (R. 165.)

Steven Wise, Psy.D., a non-examining state agency psychologist, completed Mental RFC and Psychiatric Review Technique forms of Plaintiff dated April 24, 2006. (129-145.)  Dr. Wise opined Plaintiff had mild restrictions in his activities of daily living, moderate difficulties in maintaining concentration, persistence, or pace and no episodes of decompensation of extended duration.  (R. 139.)  He concluded Plaintiff can understand and remember basic tasks, carry out simple tasks, maintain concentration and attention for routine, uncomplicated tasks for two hour periods, relate to supervisors and coworkers, complete a normal workweek without excessive interruption for psychologically based symptoms, and adapt to simple changes.  (R. 145.)

In May 2006 Plaintiff reported to a new psychiatrist at the VA, Dr. Jon D. Hodgin, M.D., that his medications were helpful in decreasing his depressive and anxiety symptoms. Nonetheless,  Dr. Hodgin assessed Plaintiff's GAF as 45.  (R. 163-64.)  In June Plaintiff's mood and affect were both anxious on a visit to Dr. Hodgin and his GAF was again assessed at 45.  (R. 162-63.)  Plaintiff reported some benefits from his medication on a visit to Dr. Hodgin in September 2006, but his affect was subdued and

his GAF was again 45. The assessment was the same on another visit to Dr. Hodgin the next month.  (R. 157-58, 370-71.)

Dr. Lauriann Sandrik, Psy.D., a non-examining state agency psychologist, completed Mental RFC and Psychiatric Review Technique assessments of Plaintiff dated December 11, 2006.  (R. 235-252.) She noted Plaintiff appeared mentally capable of completing simple, routine tasks in an appropriate amount of time and also appeared capable of appropriate interactions with other.  (R. 237.)  She concluded Plaintiff had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and no episodes of decompensation of extended duration.  (R. 249.)

Plaintiff's mood and affect were both depressed in January 2007 according to Dr. Hodgin's progress notes.  (R. 369-70.)  Plaintiff visited Dr. Sakalla on March 29, 2007 and presented with a depressed mood, congruent affect and with minimal hygiene, and Dr. Sakalla assigned him a GAF of 60.  (R. 363-64.)  In April Dr. Sakalla noted, although Plaintiff presented with "notable improvement and better hygiene," "depression remains a factor . . .  likely to hinder the process if support was not available."  (R. 359-60.)  Plaintiff reported benefits for his depression and anxiety from his prescribed medications on visits to Dr. Hodgin in late April 2007 and in May 2007, but his GAF remained at 45.  (R. 357-59.)  On a May 2007 visit to Dr. Sakalla, the doctor noted Plaintiff "continues with stability" but noted Plaintiff's mood was overall dysthymic with a congruent affect.  (R. 357.)

Plaintiff did not return to the Gainesville VA for treatment of his depressive and anxiety symptoms again until May 21, 2008, as he had been in Hawaii in the interim

11

dealing with criminal charges against him that were eventually dismissed.  (R. 341.)  A

mental health initial assessment was performed on that date and reflected continued

social anxiety, a lack of focus and concentration, and a lack of energy and interest.  (R.

341-44.)  On May 23, 2008, Dr. Sakalla noted Plaintiff's depression was at Plaintiff's

baseline "despite resolution of his distress" related to the Hawaii criminal charges. He

assigned Plaintiff a GAF of 60.  (R. 340-41.)  Plaintiff saw Dr. Jose Llinas, M.D., who

was filling in for Dr. Hodgin, on June 12, 2008. Dr. Llinas noted Plaintiff's "emotional

reactions show[ed] elements of depression and anxiety" and assigned a GAF of 60.  (R.

334-36.)  Plaintiff's responses to a Hirschfeld Mood Disorders Questionnaire that day

reflected trouble with thoughts racing through his head and concentrating.  (R. 335-36.)

On July 11, 2008 Plaintiff presented with a decline in mood and a more reserved

and quiet affect.  He was unable to engage fully in the meeting, and Dr. Sakalla

assigned him a GAF of 60.  (R. 328.)  Plaintiff reported a slight improvement in his

mood when contacted by telephone by Dr. Sakalla on July 17, 2008.  (R. 323, 329.)

Plaintiff reported a minor improvement in his symptoms to Dr. Sakalla on August

19, 2008, but Dr. Sakalla wrote this self-reported improvement "did not match his

presentation of depressed mood and congruent affect" and assigned Plaintiff a GAF of

60.  (R. 319-20.)  Plaintiff also reported he had recently made plans to go to a movie

with a friend but had to cancel the plans due to social anxiety.  (R. 320.)  On September

8, 2008 Plaintiff saw Dr. Sakalla. Plaintiff's appearance reflected minimal attention in his

hygiene. Plaintiff was more flat in presentation and was assigned a GAF of 60.  (R.

317.)  Plaintiff also requested a letter describing his condition to school authorities that

same day. Dr. Sakalla wrote Plaintiff "is seeking psychotherapy for his depression and

social anxiety that often impact his daily functioning and prevent him from pursuing social activities including work and/or school." (R. 318.)

Plaintiff also applied for and received benefits from the Department of Veterans Affairs based on his depression and anxiety during the relevant time period. On June 30, 2008, the Department of Veterans Affairs continued Plaintiff on a 70% disabled rating based on his dysthymic disorder. (R. 302-07.) In the report accompanying this decision, the VA noted "[a]lthough recent evidence shows some improvement in the condition, sustained improvement has not been definitively established." (R. 305.) The rating decision further stated "[a]n evaluation of 70 percent is assigned for occupations and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood." (R. 305.) The decision further stated "[e]ntitlement to individual unemployability is continued as you remain unable to secure or follow a substantially gainful occupation as a result of your service-connected disabilities." (R. 306.)

The Department of Veterans Affairs based its continuation of Plaintiff on 70% disability on Medical Source Statement and Mental Impairment Questionnaire forms completed by Dr. Sakalla, Plaintiff's treating psychologist. (R. 308-16.) In these forms, Dr. Sakalla noted he had met with Plaintiff 15 times between October 17, 2005 and September 2008. (R. 308.) Dr. Sakalla opined that Plaintiff's current GAF was 50 and identified Plaintiff's signs and symptoms as: appetite disturbance with weight change, sleep disturbance, anhedonia or pervasive loss of interests, social/emotional withdrawal or isolation, blunt, flat or inappropriate affect, mood disturbance, decreased energy and pathological dependence or passivity. (R. 308, 314.) Dr. Sakalla noted Plaintiff had

experienced depression and social isolation with an ongoing decline.  (R. 309.)  Dr.

Sakalla opined Plaintiff's impairments or treatment would result in Plaintiff being absent

from work more than three times a month and Plaintiff would be able to perform the

basic mental activities of work for only 1/3 of an 8-hour workday.  (R. 309-10.)  He also

opined Plaintiff exhibited marked restriction in his activities of daily living, extreme

difficulties in social functioning, frequent deficiencies of concentration, persistence or

pace resulting in a failure to complete tasks in a timely manner, marked difficulties in

maintaining concentration, persistence or pace and one or two episodes of

decompensation in the previous twelve months.  (R. 311-12, 315.)  Dr. Sakalla also

opined Plaintiff exhibited a current history of one or more years' inability to function

outside a highly supportive living arrangement.  (R. 316.)

      **C.**    <u>**Hearing Testimony**</u>

Plaintiff testified at his administrative hearing.  He testified that he began having

issues with depression in 2000 when serving in the Navy.  (R. 487.)   Plaintiff was

placed on medical hold in 2000 for six months and then again in late 2001 in order to

attend therapy and receive medications. (R. 488, 490.)  In 2002 his depression

worsened to the point where he was discharged from the Navy.  (R. 489.)

Plaintiff stated a typical day for him consists of waking up, feeding his cat, and

then sometimes laying down in the afternoon as a result of his medications.  (R. 491.)

He takes Clonazepam for his anxiety and Duloxetine for depression.  (R. 491-92.)

A Vocational Expert ("VE") also testified at the administrative hearing.  The VE

stated Plaintiff's past relevant work consisted of the position of computer technician, a

light work position that is skilled in nature.  (R. 492-93.)  The ALJ asked the VE to

14

assume a hypothetical individual of Plaintiff's age, education level, past work experience and body habitus.  (R. 494.)  He then asked the VE to assume the hypothetical individual was limited to low stress, simple, unskilled work requiring one, two or three step instructions; could only lift and carry 10 pounds frequently and 20 pounds occasionally; could stand for a total of six hours and sit for six hours in an eight hour work day; should avoid frequent ascending/descending of stairs; should avoid hazards in the workplace; is limited to no climbing and occasional balancing, stooping, crouching, kneeling and crawling; and is confined to a relatively clean work environment.  (*Id.*)  The hypothetical individual also has depression which affects his ability to concentrate upon complex or detailed tasks but he would remain capable of understanding, remembering and carrying out simple job instructions.  (*Id.*)

The VE testified such an individual would be unable to perform Plaintiff's past relevant work.  (*Id.*)  He further testified such a hypothetical individual could perform, however, some unskilled jobs, such as a mail clerk, a factory packager and a fast food worker.  (R. 495.)  The VE further testified there are 2,352 mail clerk jobs in central Florida and more than 500,000 in the national economy, 4,285 factory packager jobs in cental Florida with 1,000,000 jobs in the national economy, and 31,360 fast food jobs in the central Florida area with 3,000,000 jobs in the national economy.  (*Id.*)  The ALJ then asked the VE to further assume the hypothetical individual's depression was of such severity it would take the individual off task for at least three days out of a work week and asked if that would change the VE's answer in any way.  (*Id.*)  The VE testified such an individual would not be able to perform any of the mail clerk, factory packager or fast food worker positions.  (*Id.*)

15

### D.   The ALJ's Findings

In his written decision, the ALJ concluded Plaintiff had the severe impairments of depression and generalized anxiety disorder.  (R. 407.)  He determined Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings. (R. 407-08.)  The ALJ further concluded Plaintiff had the RFC to perform light work except he was limited to low stress, simple and unskilled work with one, two or three step instructions; can only lift ten pounds frequently and twenty pounds occasionally; can stand, stand and walk for six hours in an eight hour work day; should avoid frequent ascending and descending of stairs as well as other hazards in the workplace.  (R. 409.)  Plaintiff was also restricted to a relatively clean work environment; cannot climb and can only balance, stoop, kneel, crouch or crawl occasionally; and is only capable of remembering and carrying out simple job instructions.  (*Id.*)

The ALJ concluded Plaintiff was unable to perform any of his past relevant work. (R. 415.)  The ALJ further concluded, considering the Plaintiff's age, education, work experience and residual functional capacity, there were jobs which existed in significant number in the national economy Plaintiff could have performed through the date last insured of December 31, 2007.  (R. 416.)  In support of this conclusion, he cited the VE's testimony at Plaintiff's hearing that a hypothetical individual with Plaintiff's vocational profile could perform the positions of mail clerk, factory packager and fast food worker.  (*Id.*)  He thus concluded Plaintiff had not been under a disability from April 28, 2004, the alleged disability onset date, through December 31, 2007, Plaintiff's date last insured.  (R. 417.)

# IV.  DISCUSSION

Plaintiff argues that the ALJ committed four errors in his written decision. Two of the issues raised by Plaintiff are that the ALJ ignored the Plaintiff's 70% Va disability rating and that the ALJ erred in his treatment of Dr. Khalil Sakalla's treating psychologist's opinion. Because the Court determines the ALJ erred in not giving appropriate controlling weight to the opinion of Dr. Sakalla, a treating doctor, the Court need not reach the other errors raised by Plaintiff.

The Court will discuss first the ALJ's error in not giving controlling weight to Dr. Sakalla's opinion and then briefly discuss Plaintiff's argument that the ALJ erred by ignoring the Plaintiff's VA disability rating. The Court will conclude with a discussion of whether remand for further proceedings or remand with directions that benefits be awarded is the proper remedy.

### A.   The ALJ's Conclusion to Accord Little Weight to the Opinion of Dr. Sakalla, A Treating Psychologist, Is Not Supported By Substantial Evidence

Plaintiff contends the ALJ erred in failing to give appropriate weight to the opinions expressed by Plaintiff's treating psychologist, Dr. Khalil Sakalla.  After carefully examining the record and the written decision of the ALJ the Court concludes that substantial evidence does not support the ALJ's conclusion to accord little weight to the opinion of Dr. Sakalla, a treating psychologist, who treated Plaintiff more than fifteen times during a three year period.  Rather, the substantial evidence of record including Dr. Sakalla's own progress notes and the progress notes of Plaintiff's treating psychiatrists at the VA support Dr. Sakalla's opinions.

It is well-established that substantial or considerable weight must be given to the

17

opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[23]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[24]  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[25]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[26]

The Department of Veterans Affairs based its continuation of Plaintiff on 70% disability rating in June 2008 on Medical Source Statement and Mental Impairment Questionnaire forms completed by Dr. Sakalla, Plaintiff's treating psychologist.  (R. 308-316.)  In his written decision, the ALJ reviewed Dr. Sakalla's opinions expressed in the two medical source statements. (R. 414.)  The ALJ , however, gave little weight to Dr. Sakalla's opinions as reflected in those forms because the ALJ found the opinions were

---

[23] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997))("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[24] 20 C.F.R. § 404.1527(d)(2).

[25] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[26] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

not supported by Dr. Sakalla's own progress notes and were not consistent with the

progress of the treating psychiatrist at the VA.  Specifically, the ALJ found:

> "Dr. Sakalla's opinion is not supported by his own progress notes or the
> progress notes of his psychiatrist at the Veteran's Administration.  If Dr.
> Sakalla's opinion was founded, the claimant would not be able to leave
> the house or perform any activities.  Progress notes show his mood okay.
> He would have some ups and downs with his anxiety, however, it had
> been noted on several occasions that his medication regimen was helpful
> with no side effects.  In fact, Dr. Sakalla's progress notes show that the
> claimant's memory and concentration were unimpaired.  There is no
> evidence of episodes of decompensation as found by Dr. Sakalla."

(R. 415.)  In support of his decision to accord little weight to Dr. Sakalla's opinion, the

ALJ relied upon the opinions of the two non-examining state agency psychologists.  (R.

415.)  Both state agency psychologists – neither of whom examined, tested or

personally evaluated Plaintiff – concluded that Plaintiff had mild restrictions in his

activities of daily living, moderate limitations in his social functioning, mild to moderate

deficiencies in concentration, persistence and pace and no episodes of

decompensation.  (R. 129-45, 235-52.)  The ALJ also relied upon the state agency

psychologists' opinions in concluding Plaintiff did not meet any of the Listings at Step

Three of the sequential analysis.  (R. 407-09.)

The ALJ's decision to give little weight to Dr. Sakalla's treating psychologist

opinion was not supported by substantial evidence in the record.  Despite the ALJ's

conclusion to the contrary, the progress notes from Plaintiff's visits to both Dr. Sakalla

as well as his appointments with his psychiatrists at the VA supported the opinions

expressed by Dr. Sakalla in the medical source statements.

Dr. Sakalla's own progress notes are consistent with the opinions expressed in

his medical source statements.  Dr. Sakalla had the longest longitudinal history of any

of Plaintiff's treating medical professionals, having seen Plaintiff no fewer than 15 times between October 2005 and June 2008, when he authored the medical source statements.  (R. 308.)   While there is some passing notation of improvement in the progress notes, the overall record of Plaintiff's symptoms as reflected in the progress notes evidence that Plaintiff's symptoms actually worsened over the course of his three year treatment by Dr. Sakalla. (R. 309.)

For example, at his first meeting with Dr. Sakalla in October 2005 the progress notes reflect that Plaintiff "appeared in distress" over his "discomfort level and feelings of anxiety/phobia." Three years later in 2008, Plaintiff's mood had declined to such a degree that Plaintiff could not even participate in a session with Dr. Sakalla despite all his ongoing treatment.  (R. 184-85, 328, 340-41.)

Further, Dr. Sakalla's progress notes reflect that Plaintiff was not able to take care of basic life activities like appropriate grooming. The notes from many visits reflect that Plaintiff had minimal hygiene or as Dr. Sakalla described Plaintiff appeared "unkempt with poor hygiene."  (R. 164, 317, 363-64.)  The record also reflects that Dr. Sakalla wrote two letters to school authorities in which Dr. Sakallla stated Plaintiff's depression and social anxiety "often impact his daily functioning and prevent him from pursuing social activities including work and/or school."  (R. 165, 318.)  In short, Dr. Sakalla's progress notes contain observations, findings and conclusions – during a three year period of time – supportive of the opinions expressed by Dr. Sakalla in the medical source statements.

Contrary to the statement of the ALJ, the progress notes from Plaintiff's visits to his treating psychiatrists at the VA also support Dr. Sakalla's opinions in the medical

source statements.

Dr. Gamberino, Plaintiff's treating psychiatrist at the VA from October 2004 to March 2006, assigned Plaintiff GAF scores ranging between 45 and 57 and wrote numerous times that Plaintiff "suffered from extreme impairment socially and occupationally."  (R. 166-67, 180-81, 185-95, 200, 209-12.)  The progress notes from Dr. Hodgin, Plaintiff's treating psychiatrist from May 2006 to May 2007, while reflecting some benefit from medications, nonetheless, report that Plaintiff's improvement was only slight. Notably, during this period of time  Dr. Hodgin consistently assessed Plaintiff's GAF at 45.  (R. 157-58, 162-64, 357-59, 369-70.)  Accordingly, contrary to the finding by the ALJ, the progress notes from Plaintiff's treating psychiatrists support the conclusion that Plaintiff's symptoms were significant and consistently resulted in GAF scores in the 40's

The ALJ observed that "If Dr. Sakulla's opinion was founded, the claimant would not be able to leave the house or perform any activities."  This conclusion obviously is derived from Dr. Sakalla's opinion that Plaintiff had extreme limitations with maintaining social functioning. However, even assuming this opinion was inconsistent with the progress notes, Both Dr. Sakalla's progress notes and the opinions from the treating psychiatrists demonstrate serious or marked difficulties in maintaining social functioning. Marked difficulties in maintaining social functioning in combination with marked restrictions of activities of daily living and frequent deficiencies in concentration, persistence and pace are more than sufficient to support the functional limitations noted by Dr. Sakalla. Rather than according Dr. Sakalla's opinions with little weight, the ALJ should have given Dr. Sakalla's opinions appropriate weight in assessing Plaintiff's

RFC.   Because the ALJ failed to accord appropriate weight to Dr. Sakalla's opinions that Plaintiff had at least marked difficulties in activities of daily living and frequent deficiencies in concentration, persistence and pace – and completely discounted Dr. Sakalla's opinion that Plaintiff had significant difficulties in maintaining social functioning – the ALJ's evaluation of Plaintiff's RFC was flawed. Because the RFC was flawed the hypothetical questions posed to the VE were not supported by substantial evidence.

Accordingly, this cause should be remanded to the Commissioner to give proper weight to Dr. Sakalla's opinions as expressed in the medical source statements. The ALJ can then conduct the appropriate evaluation at Step three to determine whether Plaintiff met a Listing and if not to then evaluate Plaintiff's RFC at step four of the sequential analysis.  the appropriate analyses at Steps Three and Four.

### B.  Plaintiff's VA Disability Rating

Because the case is due to be remanded, the Court will address the issue of the appropriate weight to be given to Plaintiff's 70% VA disability rating.  Plaintiff contends the ALJ gave this rating little or no weight.  Upon remand, the ALJ should accord great weight to the VA's disability great weight, as required by law.

The ALJ reviewed the Plaintiff's VA disability rating as part of his finding that Plaintiff's allegations of a disabling impairment were not totally credible.  Specifically, the ALJ found: "Though the Veteran's Administration has granted a 70% service connected disability rating due to his mental disorder, the Social Security Administration is not bound by any other agencies in determining disability.  Social Security has its own rules and regulations in regards to disability."  (R. 415.)

The Commissioner and the VA are indeed guided by different standards in

determining whether a claimant or veteran is disabled.  Social Security regulations define disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[27]  The impairment must be severe, making a plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[28]

On the other hand, the pertinent VA regulations provide "Total disability will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation. Total disability may or may not be permanent."[29]  Thus, being deemed disabled by the VA does not necessarily mean one is also disabled for Social Security purposes.

As the Commissioner points out, Social Security regulations make clear the Commissioner is not bound by another agency's determination of a disability.[30] Relevant Eleventh Circuit precedent, however, mandates that while the decisions of other agencies are not binding the Commissioner must give decisions by other

---

[27] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005).

[28] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[29]  38 C.F.R. § 3.340(a)(1).

[30] *See* 20 C.F.R. §§ 404.1504; 416.904 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.").

agencies – such as the VA -- great weight[31]  Accordingly, on remand the ALJ should

carefully evaluate the VA's June 2008 continuation of Plaintiff on 70% disability and

give appropriate weight to the VA's 70% disability rating in determining whether Plaintiff

is disabled for Social Security purposes. To the extent that the ALJ determines that the

VA disability rating should not be given great weight he should articulate specific

reasons supported by substantial evidence in the record to support that decision.

### C.    Remand For Further Proceedings Is the Appropriate Remedy

Having determined that the ALJ erred by not according controlling weight to Dr.

Sakalla's opinions the Court must determine whether the case should be remanded for

further proceedings or should be remanded with directions that benefits be awarded.  In

his brief Plaintiff asks the Court to remand with directions to the Commissioner to find

Plaintiff disabled and grant his application for disability insurance benefits.  The Court,

however, concludes remand to the Commissioner for further proceedings is the

appropriate remedy.

Remand is the appropriate remedy in this case because the ALJ will be required

to make findings at step three and step four of the sequential analysis after according

appropriate weight to the opinion of Dr. Sakalla. Decisional authority from the Eleventh

Circuit also supports the conclusion that the proper remedy where an ALJ fails to make

an adequate determination of the weight to be given to a treating physician's opinion is

to remand the case to the Commissioner so that the ALJ can evaluate properly the

---

[31] Brady v. Heckler, 724 F.2d 914, 921 (11th Cir. 1984)("'Although the V.A.'s disability rating is not binding on the Secretary of Health and Human Services, it is evidence that should be given great weight.'")(quoting Olson v. Schweiker, 663 F.2d 593, 597 n.4 (5th Cir. 1981)).

treating physician's opinion in light of the appropriate weight.[32]   This approach is consistent with the Supreme Court's observation in <u>INS v. Ventura</u> that a court reviewing the decision of an administrative agency may not "'conduct a *de novo* inquiry into the matter being reviewed and reach its own conclusions based on such an inquiry'" but that "'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'"[33]

After the ALJ has given appropriate weight to Dr. Sakalla's opinion because the ALJ will be required to make a finding to determine whether Plaintiff meets the listing requirements at Step Three, and if not, to evaluate Plaintiff's RFC at Step Four – and because it would be wholly inappropriate for this Court to engage in factfinding – remand to the Commissioner for further proceedings is the appropriate remedy.

## V.  **RECOMMENDATION**

In view of the foregoing, it is respectfully **RECOMMENDED** that pursuant to Sentence Four of 42 U.S.C. § 405(g) the decision of the Commissioner should be **REVERSED AND REMANDED** to the Commissioner  for further proceedings so that the ALJ can accord proper weight to the opinion of the treating psychologist, Dr. Khalil Sakalla, Ph.D; accord appropriate weight to the VA's June 2008 70% disability rating;

---

[32] *See, e.g.*, <u>Johns v. Bowen</u>, 821 F.2d 551, 557 (11th Cir.1987); <u>Mason v. Bowen</u>, 791 F.2d 1460 (11th Cir.1986); <u>Lawton v. Commissioner of Social Sec.</u> 431 Fed. Appx. 830, 835 (11th Cir. 2011)(*per curiam*)("Accordingly, rather than broadly accepting the doctors' opinions as true, we will remand to the agency so that it can make a determination in the first instance of the proper weight to be afforded to those opinions."). *See, contra*. <u>MacGregor v Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986)  (suggesting reversal for payment of benefits is the appropriate remedy when the Commissioner fails to explain the weight afforded to a claimant's treating physician.)

[33] <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002)(quoting <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985) and <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947)).

and to conduct such further proceedings that the Commissioner deems appropriate.

**IN CHAMBERS** in Gainesville, Florida, on December 14, 2011.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


### <u>NOTICE TO THE PARTIES</u>

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**